IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| M-AUDITS, LLC, | ) | CASE NO. 1:15CV1433 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| HEALTHSMART BENEFIT | ) | |
| SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

This case arises from a dispute between a company that reviews claims submitted under health benefit plans, Plaintiff M-Audits, LLC ("M-Audits"), and a Third Party Administrator ("TPA") for such plans, Defendant HealthSmart Benefit Solutions, Inc. ("HealthSmart"). Earlier in the case, the parties resolved M-Audits' Motion for Temporary Restraining Order by agreeing to the entry of an Order pursuant to which HealthSmart is required to refer claims meeting certain criteria to M-Audits for review. M-Audits has filed a Motion to Show Cause and Application for Order of Contempt ("Motion"). Doc. 24. In its Motion, M-Audits asserts that HealthSmart violated the agreed Order entered by the Court on August 24, 2015 (Doc. 22) by failing to send to M-Audits for bill review claims that met the criteria set forth in the Order. M-Audits also contends that HealthSmart violated the Order by drafting and sending to brokers a letter dated November 6, 2015, which M-Audits alleges was intended to discourage clients from using M-Audits for bill review. Doc. 33, pp. 5-6.

The Motion was referred to the undersigned by District Judge Sara Lioi pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72, and LR 72.2. Doc. 25. HealthSmart filed an Opposition to the Motion (Doc. 27) in which it admitted that, following the entry of the Order, it stopped

1

referring to M-Audits all claims that fell under Cigna and Aetna contracts (Doc. 27, p. 3); it contended nevertheless that it "never violated a specific provision of this Court's Order."  *Id*., p. 4.  The undersigned held an evidentiary hearing on the Motion on January 4, 2016 (the "Hearing"), prior to which the parties filed Pre-Hearing Briefs.  Docs.  41, 43.

For the reasons explained below, the undersigned recommends that M-Audits' Motion be **GRANTED in part** because clear and convincing evidence establishes that HealthSmart violated the Order by failing to refer to M-Audits for bill review all claims submitted to health insurers Cigna, Aetna, Cofinity, FirstHealth, and Student Educational Benefit Trust ("SEBT") that met the referral criteria set forth in the Order.  HealthSmart should be found in contempt of the Order and should be required to pay M-Audits the amount of the losses it sustained as a result of HealthSmart's violations of the Order.  HealthSmart should also be required to pay M-Audits its reasonable attorneys' fees and expenses incurred in connection with the Motion.  Because M-Audits' losses cannot be ascertained without an audit, the undersigned further recommends that HealthSmart be ordered to pay for the cost of an audit. M-Audits' Motion should be **DENIED in part** because HealthSmart did not violate the Order by sending the November 6, 2015, letter to brokers.

## I. Background

### A.  The history of the relationship between M-Audits and HealthSmart as alleged by M-Audits[1]

M-Audits is an auditing firm primarily engaged in providing claim review services for health benefit plans, including health plans that were administered by Commerce Benefit Group ("CBG"), a TPA for self-insured health care plans.  Doc. 6-2, p. 2, ¶¶5, 6.  On or about July 1, 2014, HealthSmart purchased the assets of CBG pursuant to an Asset Purchase Agreement ("APA").  *Id*. at ¶4.

---

[1] These background facts were taken from M-Audits' Complaint (Doc. 6-2).

Initially, M-Audits' assets were to be included in the APA along with the assets of CBG and four other smaller entities. *Id*. at ¶7.  After nearly a year-long negotiation, a deal was reached for the purchase of the assets of all six entities, including M-Audits, for a total purchase price of seven million dollars. *Id*.  The deal structure included payment by HealthSmart of $1.5 million and $5.5 million "pursuant to three year earn-out schedules for CBG and M-Audits." *Id*. at ¶8.

Prior to the scheduled closing, HealthSmart notified CBG and M-Audits that its lender, Silver Point Finance, was demanding that all payments earned by CBG and M-Audits pursuant to the earn-out schedules be subordinated to any debt owed to Silver Point. *Id*. at ¶9.  M-Audits did not agree to the subordination. *Id*. at ¶10.  HealthSmart suggested an alternate structure that would include removing the assets of M-Audits from the APA and purchasing the assets of M-Audits pursuant to a Side Letter Agreement. *Id*., p. 3, ¶10.  Accordingly, HealthSmart and M-Audits entered into a Side Letter Agreement for the purchase of M-Audits' assets. *Id*. p. 2, ¶4.  The Side Letter Agreement and the APA closed on or about July 1, 2014. *Id*. p. 3, ¶12.  The Side Letter Agreement provides that HealthSmart would use commercially reasonable efforts to cause its customers to enter into the M-Audits Service Agreement. *Id*., p. 3, ¶13.  It was contemplated that, in this way, M-Audits would receive referrals for bill review that would generate sufficient profits to reach the agreed earn-out purchase price for its assets.

M-Audits provided copies of all its customer contracts to HealthSmart. *Id*. at ¶14.  M-Audits' Service Agreement with its customers includes an automatic renewal provision absent notice of intent not to renew at least sixty days prior to the initial or renewal term. *Id*.  M-Audits did not receive a notice of termination from any customer under contract at the time HealthSmart purchased CBG. *Id*. pp. 3-4, ¶15.  Nevertheless, the revenues from these customers (now using HealthSmart as their TPA) declined over 200%. *Id*.  M-Audits alleged in its Complaint that the

reason for the decline in revenue after July 1, 2014, is that HealthSmart diverted auditing business away from M-Audits in violation of M-Audits' contracts with its customers.  *Id*.

HealthSmart began to use a company called PHX to route claims to M-Audits.  *Id*. at ¶18. M-Audits learned that PHX is primarily an auditing firm and a competitor of M-Audits.  *Id*. Over the next several months and continuing through May 2015, HealthSmart referred only a small percentage and a small dollar volume of claims to M-Audits.  *Id*. at ¶20.  In late May 2015, HealthSmart took the position that it had no obligation to make efforts to get HealthSmart customers to enter into Service Agreements with M-Audits and that it was acting reasonably because it asked PHX to forward some claims to M-Audits.  *Id*.  M-Audits alleges that PHX was given full discretion for routing (or not routing) claims to M-Audits, thereby making it unlikely that M-Audits will be able to generate revenue to cover its operating expenses or earn its owner the intended purchase price for its assets.  *Id*. at ¶24.

### B.  M-Audits filed a Complaint and a Motion for Temporary Restraining Order; thereafter, the parties participated in a settlement conference and drafted the agreed Order

On June 16, 2015, M-Audits filed a Complaint against HealthSmart in state court alleging claims of breach of contract and interference with contract.  Doc. 6-2.  On July 21, 2015, HealthSmart removed the case to this Court; pending on the state court docket at the time was a motion for temporary restraining order ("TRO") filed by M-Audits.[2]  Doc. 6-2; *Minutes of Proceeding*, 7/22/2015.  District Judge Sara Lioi referred the case to the undersigned for the purpose of holding a settlement conference to resolve M-Audits' motion for TRO.  Doc. 10.

The undersigned held a settlement conference on August 24, 2015.  Doc. 23.  Present with M-Audits' counsel were the following M-Audits representatives: Thomas Patton, CEO;

---

[2]  M-Audits' Motion for TRO was not filed on the docket of this Court.

Thomasina Patton, Owner; and Kathleen O'Leary, Clinical Nurse Manager.[3] Present with

HealthSmart's counsel were the following HealthSmart representatives: Thomas Kelly, CEO;

Sarah Bittner, General Counsel; Loren Claypool, Chief Operating Officer; and Mark Stadler,

Chief Marketing Officer.  *Id.*  After nearly a full day of discussions, the parties reached an

agreement with respect to the TRO motion; drafted an agreed-upon Order; went on the record

before District Judge Lioi to review the agreed Order; and, after the Court reviewed and

discussed the agreed Order with counsel and their client representatives, counsel and the

principals of each party advised the Court that they understood and agreed to the terms therein

and the Court approved the Order.[4] *Minutes of Proceeding*, 8/24/2015; Doc. 22 (Order).

The parties agreed that the purpose of the Order was to restore M-Audits to the position it

had been in with respect to claims referrals before HealthSmart acquired the assets of CBG.

HealthSmart's counsel stated during the August 24 proceeding:

> HealthSmart is going to send to M-Audits all the claims from the Avon Lake
> office, like M-Audits previously were handling, prior to the acquisition by
> HealthSmart.

*See also* Doc. 24, p. 4 (M-Audits agrees that the provisions of the Order were intended to be "the

reinstitution of the thresholds that existed" before HealthSmart acquired the assets of CBG).

### C. The Order

The Order provides:

> On or before September 8, 2015, HealthSmart shall forward to M-Audits for bill review
> all claims of existing accounts of the Avon Lake office and accounts developed through
> the Avon Lake office, unless contrary instructions are received from the Plan fiduciary,
> that meet any of the following criteria:
>
> > 1. All institutional in-network claims of $10,000 or more;

---

[3]  *See* Doc. 40.  O'Leary is in charge of day-to-day operations for M-Audits.

[4]  The Order resolved only M-Audits' TRO motion.  The remaining claims were dismissed without prejudice
because they had been submitted to AAA arbitration in accordance with the parties' written agreement, which
provides that disputes be submitted to arbitration with the exception of injunctive relief.

  2. All in-network multi-line physician claims; or
  3. All out-of-primary network multi-line physician claims and hospital claims
   with out of network discounts of less than 40%.

Doc. 22 (Order), p. 1.[5]

  Following the three criteria, the Order states:

  HealthSmart has neither the authority nor the obligation to refer claims to M-
  Audits for services rendered by primary network providers under Cigna or Aetna
  contracts which prohibit bill review.

Doc. 22, p. 2.

  HealthSmart's counsel explained the foregoing provision (the "Cigna/Aetna provision")

to the Court as follows:

  HealthSmart doesn't have the obligation nor the authority to refer those claims
  for bill review because Cigna and Aetna prohibit that activity.

  At the January 4, 2016, Hearing on the Motion, HealthSmart's counsel admitted that his

statement in Court on August 24 as to what Cigna and Aetna prohibit was at least partially

erroneous.  Nevertheless, as is discussed below, HealthSmart's defense to the Motion is to claim

that the Order, agreed to by M-Audits, created a blanket prohibition on the referral of Cigna and

Aetna claims to M-Audits for any type of bill review.

  The Court retained jurisdiction to enforce the terms of the Order.  Doc. 22.

### D. M-Audits' Motion to Show Cause and Application for Order of Contempt alleging that HealthSmart has violated the Order

  On November 11, 2015, M-Audits filed a Motion to Show Cause and Application for

Order of Contempt ("Motion"), alleging that HealthSmart violated the Order.  Doc. 24, p. 6.   It

asserts, "Rather than increasing the claim submissions after the Order was issued, HealthSmart

has substantially decreased the claim submissions in violation of the Order."  Doc. 24, p. 2.  M-

Audits explains that, on September 3, 2015, HealthSmart notified M-Audits, via a "Client List"

---

[5]  Hereinafter, the undersigned refers to the three criteria set forth in the Order as "the three criteria."

sent to M-Audits, that as of the effective date of the Order it would be cutting off all in-network claim submissions for 91 of the 117 active Avon Lake clients, despite having sent M-Audits in-network claim submissions from these clients prior to the settlement conference.[6]  Doc. 24, p. 4. M-Audits also complains that HealthSmart drafted a letter dated November 6, 2015, and that doing so violated the Order.  Doc. 24, p. 8.

District Judge Lioi referred M-Audits' Motion to the undersigned for a report and recommendation.[7]  Doc. 25.  HealthSmart filed a response to the Motion, in which it did not contest the accuracy of M-Audits' description of events following the entry of the Order and specifically agreed that it "stopped all claim referrals which fell under Aetna and Cigna."  Doc. 27, p. 3.  It maintained that the actions it took were in compliance with the Order, reasoning that M-Audits, by agreeing to the Order, agreed that HealthSmart "was not required to refer to it any Cigna or Aetna claims." Doc. 27, pp. 3-4.[8]  It also argued that the contents of the November 6, 2015, letter did not violate the Order and, in any event, HealthSmart did not send the letter to any clients.  Doc. 27, pp 4-6.  M-Audits filed a brief in reply, in which it maintained that the Cigna and Aetna contracts do not prohibit bill review and the letter violated the Order; it also argued, for the first time, that HealthSmart violated the Order because it was sending M-Audits SEBT

---

[6]  Kathleen O'Leary, M-Audits Clinical Nurse Manager who oversees M-Audits operations, explained in her testimony at the January 4, 2016, Hearing on the Motion (the "Hearing") that the Client List sent by HealthSmart in September 2015 contained a column that stated either a threshold dollar amount for claims sent or listed "Cigna" or "Aetna" with an Aetna subsidiary's name in that column as a reason a claim was not sent.  *See also* Exhibit 2 ("Client List with Thresholds").  The Client List is also referred to by M-Audits as a "threshold document" or "customer list."  *See* Doc. 32-1 (Client List filed by M-Audits, under seal, titled, "Customer List").  The undersigned refers to this list as the "Client List" for the balance of this report and recommendation.

[7]  The referral order directs the undersigned to issue a report and recommendation "and, if appropriate, to conduct an additional settlement conference."  Doc. 25.  At the January 4, 2016, Hearing, counsel for M-Audits stated that his client did not wish to engage in settlement discussions at that time.

[8]  HealthSmart did not submit any evidence in support of its responsive brief, despite the undersigned ordering the parties to file all supporting documents by December 8, 2015.  *See* Doc. 30.

claims at a $25,000 threshold level rather than the $10,000 threshold level set forth in the Order. Doc. 33.

The undersigned set a Hearing date.  After HealthSmart filed a motion to continue the Hearing, the undersigned held two telephone conferences with counsel.  Doc. 34, 37, 38.  During the first telephone conference, counsel for HealthSmart agreed to send to counsel for M-Audits a list of all claims submitted to HealthSmart since September 8, 2015 ("Claims List") that pertain to the clients identified in the Client List and that meet the three criteria outlined in the Order. Doc. 37, pp. 1-2.  During the second telephone conference, counsel for M-Audits stated that the Claims List it received was incomplete because it only contained in-network hospital claims and not out-of-network hospital claims or in-network and out-of-network physician claims. *See* Doc. 38.  Counsel for HealthSmart stated that he would work with relevant HealthSmart personnel to provide a complete list and also agreed to include all SEBT claims at and above the $10,000 level. *Id.*  Subsequently, M-Audits acknowledged that it received what appeared to be a complete Claims List on December 29, 2015.  Doc. 39.  According to M-Audits, the Claims List includes approximately 64,000 lines of claims information that should have yielded about 15,000 claims that should have been sent to M-Audits for review when, in fact, a far smaller number of claims was sent.

The undersigned granted HealthSmart's request to reset the Hearing date and instructed the parties to file stipulations and pre-hearing briefs framing the disputed issues.  Doc. 37, p. 2. A Hearing was held on January 4, 2016; both side presented witness testimony and submitted documentary evidence.  *See* Doc. 47.

## II. Standard of Review

In this civil contempt proceeding, the moving party, M-Audits, must prove by clear and convincing evidence that HealthSmart violated "a definite and specific order of the court

requiring [it] to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998) (quoting *Glover v. Johnson*, 934 F.2d 703, 707 (6th Cir. 1991)). If M-Audits satisfies its initial burden to make a *prima facie* showing of a violation, HealthSmart thereafter has the burden to prove an inability to comply. *Id.* (citing *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995)). "[T]he test is not whether defendants made a good faith effort at compliance but whether the defendants took all reasonable steps within their power to comply with the court's order." *Id.* (quoting *Glover*, 934 F.2d at 708); *see also United Steelworkers of Am., AFL-CIO, CLC v. Roemer Indus., Inc.*, 2000 WL 724536, *2 (N.D.Ohio Feb. 25, 2000). Because the Order at issue in this case was a consent Order, its meaning is a question of contractual interpretation. *See Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 372 (6th Cir.1998); *G.G. Marck and Assocs., Inc. v. Peng*, 309 Fed. App'x 928, 934 (6th Cir. 2009)(stipulated injunctive relief is a form of consent judgment).

"Although civil contempt may serve incidentally to vindicate the court's authority, its primary purposes are to compel obedience to a court order and compensate for injuries caused by noncompliance." *TWM Mfg. Co., Inc. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir. 1983) (citing *McCrone v. United States*, 307 U.S. 61, 64 (1939)); *Downey v. Clauder*, 30 F.3d 681, 685 (6th Cir. 1994) (citing *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994); *United States v. Bayshore Assocs., Inc*., 934 F.2d 1391, 1400 (6th Cir. 1991)). Fines may be imposed against the party held in contempt, including attorney fees and expenses. *TWM Mfg. Co.*, 722 F.2d at 1273.

### III. Analysis

#### A. Summary of issues

9

It is undisputed that, after the effective date of the Order, HealthSmart stopped sending M-Audits all Cigna and Aetna claims.  HealthSmart's Opposition admits that it "stopped all claim referrals which fell under Aetna and Cigna . . . ."  Doc. 27, p. 3.  HealthSmart also admits that, for a period of time, it stopped sending all Cofinity and FirstHealth claims on the basis that those companies are subsidiaries of Aetna.[9]  Thus, a key issue is whether the Order permitted HealthSmart to stop sending the Cigna, Aetna, and Aetna subsidiary claims.  HealthSmart, in its Pre-Hearing Brief, contends that its action in stopping the referral of those claims was sanctioned by two provisions of the Order that limit its obligation to "forward to M-Audits for bill review all claims" of Avon Lake accounts that meet the three referral criteria.  Doc. 43, p. 3.  The first is the exception that applies when "contrary instructions are received from the Plan fiduciary" (the "Plan Fiduciary exception") (Doc. 22, p. 1).  The second is the Cigna/Aetna provision of the Order quoted above.

As explained in more detail below, the provisions of the Order cited by HealthSmart do not support its position.  With respect to the Plan Fiduciary exception, the undisputed evidence presented at the hearing by HealthSmart itself establishes that "bill review" encompasses three types of audits and that only one of the three types, which is not at issue, is even arguably forbidden by contrary instructions received from a Plan fiduciary. With regard to the Cigna/Aetna provision, HealthSmart argues that the parties agreed, and the Order embodied their agreement, to create a prohibition, which it admits is not found in the Cigna or Aetna contracts, forbidding the referral of all Cigna and Aetna claims to M-Audits.  HealthSmart contends that M-Audits is now bound by its agreement to the language in the Order that purportedly created the new prohibition.  *See* Doc. 27, pp. 3-4.  HealthSmart's interpretation of the second provision is simply wrong.  It depends on ignoring the phrase "which prohibit bill review" in the

---

[9] While HealthSmart asserts that it resumed sending Cofinity and FirstHealth claims, M-Audits contends that those claims are not yet being sent.  Doc. 32-1, ¶¶5, 11.

Cigna/Aetna provision as well as the parties' intent expressed on the record before the Order was entered.

With respect to SEBT claims, HealthSmart argues that the Court should not enforce the clear and unambiguous language in the Order, which provides that all institutional in-network claims of $10,000 or more be forwarded for review because that would contradict the parties' intention that referrals be restored to what they were before HealthSmart's acquisition of CBG. The parties dispute what the pre-acquisition threshold for referral of SEBT claims was: M-Audits says it was $10,000 while HealthSmart says it was $25,000. Although the weight of the evidence supports HealthSmart's assertion that the pre-acquisiton threshold was $25,000, there is no ambiguity in the Order to be construed or interpreted with respect to the SEBT issue. Accordingly, the undersigned must apply the clear and unambiguous threshold of $10,000 set forth in the Order.

### B.  HealthSmart violated the Order when it stopped sending M-Audits Cigna, Aetna, Cofinity and FirstHealth claims that met the three criteria in the Order.

#### 1.  The Plan Fiduciary Exception Does Not Apply.

In its Pre-Hearing Brief, HealthSmart contends that it was compliant with the Order when it stopped sending M-Audits Cigna and Aetna claims because the Plan Fiduciary exception applies and "contrary instructions were received from the plan fiduciary." Doc. 43, p. 3. To support this argument, HealthSmart cites verbal instructions and letters received from Cigna and Aetna by HealthSmart's Chief Marketing Officer, Mark Stadler. *Id*. This argument is somewhat confusing and misleading because Cigna and Aetna are not Plan Fiduciaries; accordingly, instructions from Cigna and Aetna are not instructions from Plan Fiduciaries.

To the extent HealthSmart contends that the Cigna and Aetna letters it has submitted (Defendant's Ex. A and B; *see also* Doc. 43-1, 43-2) are intended to convey to HealthSmart instructions given by Plan Fiduciaries to Cigna and Aetna, the letters fail to establish that Plan Fiduciaries gave Cigna and Aetna the instructions set forth in the letters. Even if the letters could be seen as sufficient to establish that Cigna and Aetna were acting on instructions from a Plan Fiduciary, HealthSmart's argument is negated by Stadler's testimony.

Stadler, who is responsible for HealthSmart's relationships with Cigna and Aetna, testified that bill review includes three types of audits: UCR audits; fraud and abuse audits; and code editing.[10] Stadler stated that, after the Court entered the Order, he verbally reached out to persons at Cigna and Aetna to ask whether their contracts[11] prohibit HealthSmart sending claims to M-Audits for bill review. *See also* Doc. 43, p. 8 (HealthSmart's Pre-Hearing Brief). As a follow-up to the undocumented conversations, he received letters from Cigna and Aetna. *Id.* The letter from Aetna states that its provider contracts do not allow for any reduction associated with UCR audits but that it would permit bill review auditing with respect to fraud and abuse and code editing. *See* Exhibit A; Doc. 43-1 (letter from Aetna). Stadler also testified that his understanding of the letter received from Cigna was that it, too, would prohibit UCR audits but would not prohibit bill review auditing based on fraud and abuse or code editing.

Thus, at most, the letters from Cigna and Aetna show that those insurers and/or Plan Fiduciaries and/or healthcare providers prohibited only UCR audits, not code editing or fraud and abuse audits. Indeed, Stadler's conclusion was that M-Audits "would be able to do code

---

[10] "UCR" (also called "U&C") stands for "usual, customary, and reasonableness." UCR audits assess whether the charges are appropriate against usual and customary standards. "Code editing" ensures that there are no miscoded or improper codes used for the services provided.

[11] The parties appear to agree that the "Cigna or Aetna contracts" referred to in the Cigna/Aetna provision of the Order means HealthSmart's contracts with Cigna and Aetna, which were admitted into evidence. Doc. 47. Some of the testimony, however, including Stadler's, appears to refer to Cigna and Aetna contracts with healthcare providers and/or Plans, which were not submitted to the Court. The difference is not material to this report and recommendation since, as set forth above, no contract was identified that prohibits referrals for bill review.

audits and fraud and abuse, but not be able to do [UCR] audits" under the letters and instructions he received from Cigna and Aetna.  Loren Claypool, Chief Operating Officer for HealthSmart, agreed that, based on Stadler's testimony, HealthSmart should have been sending Cigna and Aetna claims to M-Audits for code editing and fraud and abuse auditing provided those claims met the three criteria in the Order.  Claypool admitted that HealthSmart stopped sending Cigna and Aetna claims for the two types of review permitted.  While Claypool stated that, when referring claims for review, HealthSmart does not separate them based on the type of review to be done, he did not indicate that M-Audits could not be instructed not to do UCR reviews when claims are referred to it.

At the January 4 Hearing, M-Audits' counsel stated that M-Audits does not do UCR audits and that UCR audits are not at issue on the Motion.  The testimony of HealthSmart's own witnesses establishes that the Plan Fiduciary exception does not apply to prevent HealthSmart from sending M-Audits claims for some types of bill review.  The Court need not address whether UCR audits are prohibited because M-Audits agrees that UCR auditing is not at issue and that its contention is only that claims should have been referred for types of bill review other than UCR.  The undersigned makes no recommendation regarding UCR audits.

**2.  The Cigna and Aetna Contracts do not prohibit the referral of claims and the Cigna/Aetna Provision does not independently prohibit the referral of claims.**

Healthsmart has not identified any provision of the contracts between it and Cigna and Aetna that prohibit the referral of claims for bill review, nor does it otherwise contend that such a provision exists.  Rather, HealthSmart argues that the Cigna/Aetna provision of the Order created a new prohibition, not found in the parties' contracts, that precludes it from sending Cigna and Aetna claims to M-Audits for any type of bill review.  Doc. 27 (HealthSmart's Opposition), p. 4

13

("Plaintiff agreed [in the Order] that HealthSmart was not required to refer to it any Cigna or Aetna claims."); Doc. 43 (HealthSmart's Pre-Hearing Brief, p. 3 ("[T]he claims are also stopped in direct compliance with the provisions of the Order directly related to Cigna and Aetna.").[12]

The undersigned finds HealthSmart's argument and interpretation of the Cigna/Aetna provision to be untenable. HealthSmart's counsel admitted, during the January 4, 2016, Hearing that his representation to the Court that the Cigna and Aetna contracts prohibit bill review was erroneous. HealthSmart's argument is that the Cigna/Aetna provision constitutes an agreement by M-Audits and a determination by the Court that the Cigna and Aetna contracts do prohibit bill review and/or that bill review will not be permitted — this despite the fact that the Cigna and Aetna contracts were not before the Court and the only rationale provided to the Court for the Cigna/Aetna provision was the admittedly erroneous statement by HealthSmart's counsel. The Cigna/Aetna provision cannot be interpreted as an independent determination by the Court that the Cigna and Aetna contracts prohibit bill review for at least two reasons. First, the Court had no record on which to make such a determination. Second, that interpretation ignores the phrase "which prohibit bill review" that immediately follows the words "Cigna or Aetna contracts." That phrase is a modifier that limits the exception to Cigna or Aetna contracts that do in fact prohibit bill review.[13]

That the Order, drafted by the parties and intended to restore M-Audits to its previous position, i.e., receiving more claims, should instead be interpreted to send M-Audits fewer claims

---

[12] Claypool testified that, following the Order, HealthSmart stopped sending Cigna and Aetna claims to M-Audits because of "the filter that the order recognizes, the exclusion . . . of the Cigna/Aetna claims." He also stated, however, that the Client List was prepared based on "the direction from counsel, that those contracts did indeed prohibit bill review."

[13] HealthSmart did dispute M-Audits' contention that its action in stopping the referral of Cigna and Aetna claims was an attempt to divert business away from M-Audits by pointing out that it also stopped the referral of Cigna and Aetna claims to PHX. Doc. 27, p. 3. The fact that HealthSmart stopped sending Cigna and Aetna claims to PHX has no bearing on whether it violated the Order with respect to claims it stopped sending to M-Audits.

is not supported by the language in the Order, the intent of the parties as stated in the record before the Court, or common sense.

In sum, M-Audits has met its burden showing that HealthSmart stopped sending it Cigna and Aetna claims that otherwise met the three criteria outlined in the Order in violation of the Order; it has proven by clear and convincing evidence that HealthSmart violated a definite and specific order of the court requiring it to perform or refrain from performing a particular act or acts with knowledge of the Court's Order.  *See Glover*, 138 F.3d at 244.  HeatlhSmart cannot meet its burden showing that it took all reasonable steps within its power to comply with the Court's Order.  *Id*.  Indeed, HealthSmart admitted at the Hearing that when it stopped sending M-Audits all Cigna and Aetna claims it was "perhaps" unreasonable in its efforts to comply with the Order.  It admits that, after the Court issued the Order, it treated the Order as a "filter" to weed out claims, including the types of claims that it had been sending M-Audits prior to the Order, thus ensuring that M-Audits would receive fewer claims than it had received prior to the Order.  This is an especially telling admission because, when the Order was entered, HealthSmart represented to the Court that it "is going to send to M-Audits all the claims from the Avon Lake office, like M-Audits previously were handling, prior to the acquisition by HealthSmart. . . . I think this [Order] is worked out so it should put everything back to the way it was."

### 3. HealthSmart had no basis to stop sending M-Audits Cofinity and FirstHealth claims that met the three criteria.

M-Audits argues that HealthSmart violated the Order when it used the Cigna/Aetna provision as a reason to stop sending M-Audits claims from Aetna subsidiaries Cofinity and FirstHealth.  Doc. 24, p. 7.  In response, HealthSmart admits that it stopped sending Cofinity and

FirstHealth claims to M-Audits when the Order became effective but states that it later "reached out to these entities and obtained both clarification of the contract terms and permission to refer bill review claims.  As a result, HealthSmart immediately reactivated the referral of Cofinity and FirstHealth bill review claims to M-Audits and PHX."  Doc. 27, p. 4.

The Cigna and Aetna contracts do not apply to subsidiaries, as HealthSmart appears to concede.  *See* Docs. 32-3 (Cigna contract); 32-4 (Aetna contract); Doc. 27, p. 4.   Nor does the Order create an exception for Cigna and Aetna subsidiaries.  As a result, HealthSmart violated the Order when it stopped sending Cofinity and FirthHealth claims to M-Audits.  Despite HealthSmart's assertion that it "immediately reactivated" the referral of these claims upon receiving clarification from those entities, M-Audits disputes that those claims are now being referred.  M-Audits submitted an affidavit from Kathleen O'Leary, its Clinical Nurse Manager, stating that, since HealthSmart allegedly reactivated referral of the claims, M-Audits has not received any new claims from FirstHealth and a  minimal number of claims from Cofinity such that "it would be extremely unlikely, if not impossible, that HealthSmart is now submitting all in-network claims" from those entities.[14]  Doc. 32-1, ¶¶5, 11.

Thus, M-Audits has met its burden of showing that HealthSmart violated the Order with respect to its treatment of claim referrals from Aetna subsidiaries Cofinity and FirstHealth and HealthSmart has not presented evidence to the contrary; indeed, its action in reinstating the Cofinity and FirstHealth claim referrals can be seen as an admission that it improperly stopped sending them. Doc. 27, p. 4.  Accordingly, the undersigned finds that HealthSmart violated the Order, and may still be violating the Order, when it stopped sending M-Audits Cofinity and FirstHealth claims that otherwise met the three criteria.  *See Glover*, 138 F.3d at 244.

---

[14]  M-Audits asserts, "half of the claims that were eliminated [by HealthSmart] were not even Cigna or Aetna claims.  They were Cofinity and FirstHealth claims[.]"  Doc. 33, p. 2.

### C. HealthSmart violated the Order when it sent M-Audits SEBT claims at the $25,000 threshold level rather than at the $10,000 threshold level.

M-Audits asserts that HealthSmart violated the Order because, after the Order's effective date, HealthSmart sent it SEBT claims at the $25,000 threshold level rather than at the $10,000 threshold level provided for in the Order.  Doc. 41, p. 6.  HealthSmart contends that the threshold amount for SEBT claims sent to M-Audits prior to HealthSmart's acquisition of the assets of CBG was always $25,000.  Doc. 43, p. 6.  It asserts that the Order, therefore, contains an error based on a mistake in fact.  Doc. 43, p. 6.  HealthSmart states, "[M-Audits] knew HealthSmart believed the SEBT Claim threshold was and had always been $25,000 and further knew that HealthSmart intended to continue to send SEBT Claims in excess of $25,000 (not $10,000) one week prior to the effective date of the Order."  Doc. 43, p. 6.  Somewhat inconsistently, it also contends that Tom Patton, the CEO of M-Audits "made numerous representations at the mediation of this matter that the claim thresholds for all in-network claims were $10,000.00.  The parties relied upon and negotiated based on that premise[.]" *Id.*[15]

The clear and unambiguous language of the Order provides that HealthSmart will send M-Audits all institutional in-network claims of $10,000 or more.  At the January 4 Hearing, O'Leary testified on behalf of M-Audits that the SEBT claim threshold had been $10,000 prior to the Order and prior to HealthSmart's acquisition of CBG.  Jeanette Hobson testified on behalf of HealthSmart that the SEBT claim threshold had always been $25,000.  Neither side provided documentation that supported either of these contradictory assertions.  At the undersigned's

---

[15]  Ironically, HealthSmart's position taken here—that the intent of the Order was to reinstate M-Audits to pre-acquisition claim thresholds—cuts against its arguments described above, i.e., that HealthSmart did not violate the Order when it stopped sending Cigna, Aetna, FirstHealth and Cofinity claims after the effective date of the Order even though M-Audits routinely received these claims pre-acquisition and prior to the Order.

request, the parties thereafter submitted documentation purporting to support their positions regarding the pre-acquisition SEBT claim threshold amount.

M-Audits submitted an affidavit of James McGlamery, the executive director of SEBT Trusts, who states, "Prior to July of 2014, I was not aware of any thresholds or limitations on claims submitted for bill review and all bills were to be submitted to M-Audits for bill review on behalf of the Trusts."  Doc. 48-1, p. 1, ¶8.  This affidavit does not establish that the SEBT threshold for claims sent by CBG to M-Audits was previously $10,000.  Nor does the "Protocol Form" attached to McGlamery's affidavit; that document merely shows that a $10,000 claim threshold was in place for SEBT claims administered by Mutual Health Services, a different TPA that served SEBT.  *Id.* p. 2, ¶9; Doc. 48-2.

HealthSmart, for its part, provided an affidavit of Sherri Delestathis, who is the Team Leader for Claims at HealthSmart.  She stated that she created SEBT claim threshold spreadsheets that went into effect on August 1, 2013, and, at that time, the SEBT claim threshold amount was $25,000.[16]  Doc. 49-1, p.1, ¶¶ 3, 5, 7.  She also states that, on September 1, 2015, she created a new spreadsheet "to reflect the terms of the Order" and listed the SEBT claim threshold at $25,000 "because this threshold has never changed pre or port acquisition."  *Id.*, p. 2, ¶¶13, 14.  Documents attached to Delestathis' affidavit show that, "effective 9/1/13," the threshold for SEBT claims sent to M-Audits was $25,000.  *See* Doc. 49-3.

Although HealthSmart's evidence does not conclusively establish that the SEBT threshold for claims it sent to M-Audits was $25,000 pre-acquisition and prior to the Order, its evidence is more convincing than the evidence M-Audits has provided.  Nevertheless, the unambiguous language of the Order provides that HealthSmart shall send "[a]ll institutional in-

---

[16] HealthSmart did not purchase the assets of CBG until July 1, 2014.  *See* Doc. 6-2, p. 2, ¶4.  Delisthatis does not state what her position was in July 2013 and it is unclear why she created spreadsheets  in July 2013, unless she was employed by  CBG at that time.

network claims of $10,000 or more."  Doc. 22.  The Order does not permit HealthSmart to

unilaterally override the $10,000 criterion based on its belief that the previous threshold was

$25,000.  The fact that HealthSmart apparently did not know at the time it drafted the agreed

Order (and stated on the record to the Court that it understood and approved the agreed Order)

that the claim threshold for SEBT claims allegedly was not $10,000 but $25,000 does not permit

HealthSmart to violate the express terms of the Order.[17]  *See G.G. Marck and Assocs., 309 Fed.

App'x at 934* ("The court's task in interpreting a consent decree is to ascertain the intent of the

parties at the time of settlement.  However, the instrument must be construed as it is written[,]"

quoting *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 477-478 (6th Cir. 2007) (internal

citation and quotation marks omitted)).  Again, M-Audits has met its burden by pointing to a

definite and specific portion of the Order that HealthSmart violated with knowledge of the

Order; HealthSmart admits it did not take any steps to comply with the Order.  *See Glover*, 138

F.3d at 244.  Accordingly, HealthSmart violated the Order when it failed to send M-Audits

SEBT claims in the $10,000 to $25,000 range.


### D.  HealthSmart did not violate the Order when it drafted the November 6, 2015, letter and sent it to brokers

M-Audits contends, "HealthSmart has drafted a letter to send to all clients to discourage

the clients from using M-Audits in violation of the Order.  HealthSmart agreed to refrain from

sending this letter until the matter could be addressed by this Court."  Doc. 24, p. 6.  At the

Hearing, HealthSmart stated that it only sent the letter to brokers; thus, even if the letter would

have discouraged clients from sending claims to M-Audits, which HeatlhSmart disputes, no

---

[17] Prior to the January 4, 2016, Hearing, HealthSmart filed a Motion to Clarify/Modify Order of August 24, 2015 (Doc. 44), seeking to amend the Order to set a $25,000 threshold for SEBT claims.  The undersigned struck that Motion as premature because there had not yet been a ruling on M-Audits' Motion (Doc. 45).

clients received the letter.[18]  At the Hearing, M-Audits did not disagree that the letter was sent only to brokers and not clients; nor did it explain how sending the letter to brokers had a damaging impact upon a client's choice of where to send a claim for auditing.

The Order does not contain any provision with respect to a letter.  M-Audits argues that, by drafting and sending the letter, HealthSmart is attempting to circumvent the Order because the letter urges clients to choose a company other than M-Audits as their claims auditor.  Even if the undersigned credits M-Audits' argument that the letter would discourage clients from choosing it for bill review and that this violates the Order, the fact remains that HealthSmart did not send the letter to any clients.  M-Audits has not shown by clear and convincing evidence that HealthSmart violated a definite and specific portion of the Order and performed a particular contrary act with knowledge of the Court's Order.  *See Glover*, 138 F.3d at 244.  Thus, HealthSmart did not violate the Order when it drafted the November 6, 2015, letter and sent it to brokers.

### E.  M-Audits is entitled to an accounting at HealthSmart's expense.

M-Audits is entitled to be compensated by HealthSmart for the amount of its losses sustained as a result of HealthSmart's violations of the Order.  The Claims List provided by HealthSmart to M-Audits on December 29, 2015, contains approximately 64,000 lines of claim information that, in M-Audits' estimate, should have yielded about 15,000 claims being sent to it, a number far in excess of the claims that were actually sent.  An accounting will be required to calculate the dollar amount, including interest, M-Audits would have earned since September 8, 2015, if HealthSmart had complied with its obligation to send M-Audits[19] referrals for bill

---

[18]  In its Pre-Hearing Brief, HealthSmart states that it did not send the letter "to anyone[,]" *see* Doc. 43, p. 7.  At the Hearing it admitted that it sent the letter to brokers.

[19]  It is believed that M-Audits is compensated for its services by being paid a percentage of the dollar amount its claims reviews save health insurers and/or health benefit plans.

review in accordance with the Order.[20]  The undersigned recommends that the Court order HealthSmart to pay for the accounting M-Audits will need to have performed in order to establish the amount of its losses.

HealthSmart should further be assessed a fine of $1,000 a day for each day following the Court's ruling on the Motion that HealthSmart remains in violation of the Order.  HealthSmart should also be required to pay reasonable attorney fees and costs to M-Audits related to its Motion.  The undersigned further recommends that, in the event of additional disputes regarding compliance with the Order, the Court consider appointing a special master with the expense of the special master's services on such occasions to be split equally between the two parties.


### IV. Conclusion

For the reasons explained above, the undersigned recommends that M-Audits' Motion to Show Cause and Application for Order of Contempt (Doc. 24) be **GRANTED in part** and that HealthSmart be found in civil contempt for failure to comply with the Court's Order of August 24, 2015, when it stopped sending M-Audits claims from Cigna, Aetna, Cofinity, and FirstHealth and when it failed to send SEBT claims in the $10,000 to $25,000 range.[21]  The Motion should be **DENIED in part** because HealthSmart did not breach the Order when it sent the November 6, 2015, letter to brokers.

Accordingly, the undersigned recommends that:

(1) The Court order HealthSmart to pay for an accounting (the accountant to be selected by M-Audits) to determine the amount of loss sustained by M-Audits since

---

[20]  M-Audits asks for an accounting for the period commending in July of 2014 when HealthSmart acquired the assets of CBG.  Doc. 24, p. 11.  However, HealthSmart's violations of the Order did not begin until September 8, 2015; M-Audits, therefore, is only entitled to an accounting in this action for the period beginning September 8, 2015.

[21]  To be clear, as set forth above, M-Audits agrees that UCR audits are not at issue.

September 8, 2015, by reason of HealthSmart's violations of the Order, including pre-judgment interest and post-judgment interest as applicable at a rate calculated pursuant to 28 U.S.C. § 1961.

(2) The Court order HealthSmart to pay a fine of $1,000 a day for each day it continues to be in violation of the Order beginning seven (7) days after the Court has entered its ruling on M-Audits' Motion.

(3) The Court Order HealthSmart to pay M-Audits its reasonable attorney fees and costs expended in relation to the Motion.

(4) The Court consider referring to a special master any future disputes that may arise between the parties regarding compliance with the Order, the expense of the special master on such occasions to be split evenly between the parties.

Dated:  January 19, 2016

Kathleen B. Burke
U.S. Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).